173    218
p99a   436

MOORE et al. v. GUARDIAN TRUST COMPANY, Interpleader, Appellant, and JONES et al., Interpleaders.

Division One, March 18, 1903.

1. **Lease**: SUBLETTING: QUALIFIED TENDER OF POSSESSION. A lease by the owners of a business building to a board of trade, did not obligate the lessee to move into or occupy the building, but contained an express power in the lessee to sublet, but did not limit or restrict this power to subletting to the members of the board of trade or to persons engaged in the grain trade or like business. *Held*, that a qualified tender by the lessor to the lessee of the building "to be used and occupied by the members thereof for the purposes of such business as is usually carried on and transacted by your association and the members thereof" and demanding that the lessee "take immediate possession of said building for said purpose," was not jus-

tified or warranted by the lease. The lessor had no right to qualify its tender of possession by a condition that the building must not be sublet and a demand that the lessee itself occupy it.

2. ———: ———: INJUNCTION: BREACH. If under a lease the lessee has full power to sublet any part of the leased premises to any one it sees fit and for any purposes it chooses, it is a breach on the lessor's part to procure an injunction against the lessee from subletting the premises and from transferring and assigning the lease to a sublessee, and preventing such sublessee from enjoying, directly or indirectly, any right or privilege under the lease. And such a breach forfeits the lessor's right to claim the rent either from the lessee or sublessee.

3. ———: ———: ———: VOLUNTARY PAYMENTS TO LESSEE: TRUST FUND: INTERPLEA. Voluntary payments of the monthly rents as they fall due, made to the lessee by the sublessee, to indemnify the lessee against loss, and directed to be held by the lessee until the courts can decide whether or not the lessor has a right to enjoin the assignment of the lease or the subletting of the premises, in no sense constitute a trust fund for the benefit of the lessor, who has refused to ratify the contract of the assignment or subletting between the lessee and sublessee. But such money at all times remains the money of the sublessee depositing it. And if the lessee brings it into court and the lessor and sublessee are compelled to interplead for it, the sublessee may show that the fund was at all times his property, and that it can be used by the lessee only to pay any obligation or liability the lessee was under to the lessor under the lease, and can not be attached or seized or reached, in law or equity, by the lessor to satisfy any claim the lessor may have against the lessee. The fact that the lessee pays the money into court, even by consent of parties, does not change the right of the parties respectively thereto.

4. ———: ———: ENLARGED BY PAROL. Although it may be perfectly apparent that it was the intention of a board of trade at the time it leased the building to move into the same and to establish its trading rooms there and sublet the rooms to its members, and also that the lessor expected this would be done, yet unless these intentions and expectations were embodied in the lease, the board has the right to sublet to whom it pleases and to use the building for any purpose it sees fit, or not use it at all.

5. ———: ———: RIGHT. The right to sublet exists even where the lease contains an express prohibition against assignment.

Appeal from Jackson Circuit Court.—*Hon. Edw. P. Gates,* Judge.

REVERSED AND REMANDED (*with directions*).

*Trimble & Braley* for appellant.

(1)   The interpleaders, Jones & Oglebay, can claim no right to the fund in controversy on the theory that the trust company interfered with their lease contract with the board of trade.   Cooley on Torts, p. 497; McCann v. Wolff, 28 Mo. App. 447; Pollock on Torts, pp. 452-3.   Jones & Oglebay can not claim the fund in controversy under the circumstances of this case on the score that the trust company induced the exchange people to remain in the Exchange Building, notwithstanding the lease of the Temple Block to them.   Nor does the fact that the trust company agreed to pay the Board of Trade the sum of $500 a month for maintaining the trading hall in the Exchange Building, change the rights or relations of the parties claiming the fund in controversy.   Hunt v. Simonds, 19 Mo. 582.   (2)   Jones & Oglebay are not entitled to recover the fund in controversy on other considerations arising on the facts in this case.   They occupy the attitude of a third person suing the Board of Trade on a contract entered into by it with the trust company for their benefit.   Harberg v. Arnold, 78 Mo. App. 239; Anvil Mining Co. v. Humbel, 153 U. S. 540; Gabrill v. Brick Co., 57 Mo. App. 520; Doyle v. Turpin, 57 Mo. App. 84.   A party can not recover for breach of stipulation on a contract unless he has performed all the acts on his part which were conditions precedent, and is ready to perform those which were to be concurrently performed with the acts of the defendant.   Denny v. Kile, 16 Mo. 451.   (3)   Jones & Oglebay were not authorized under the lease contract to withhold possession of the leased premises, unless the Board of Trade and its members would move into the premises and use the same for Board of Trade purposes.   6 Lawson on Rights & Rem., secs. 2824, 2839; Gear on Landl. & Ten., sec. 97; 1 Wash. Real Prop. (1 Ed.), pp. 545-6; Nave v. Berry, 22 Ala. 382; Bregmon v. Noyes, 6 Wis. 1.   The Board of Trade had the right

not only to underlet the different rooms in the Temple Block Building, but also the "trading hall" that was fitted up on the first floor of the building. McClurg v. Price, 59 Pa. St. 420. (4) Parol evidence is inadmissible to show an extrinsic agreement that the leased premises were to be used for the specific purpose of a trading hall or on matters connected with the Board of Trade business. The lease is complete on its face; is not ambiguous, and such being the case, such evidence is incompetent. Davis v. Scovern, 130 Mo. 303; R. S. 1899, sec. 3418; Ringer v. Holtzclaw, 112 Mo. 519; Sharp v. Rhiel, 55 Mo. 97. A complete case merges all previous negotiations whether oral or written. 6 Lawson on Rights & Rem., sec. 2081; Burr v. Spencer, 26 Conn. 159; s. c., 68 Am. Dec. 379; Sontes v. Odrer, 17 La. Ann. 153; Wood, Land. & Ten. (2 Ed.), p. 624; Tracy v. Iron Works, 104 Mo. 193; Squier v. Evans, 127 Mo. 514; Macleod v. Skiles, 81 Mo. 595. The consideration in the case in question was not a mere money payment, but consisted of various mutual stipulations contained in the lease. (5) The lessors, Jones & Oglebay, violated the terms of the lease on their part in refusing to the Board of Trade unconditional possession on the ground that it contemplated a subletting of the leased premises to the trust company, and in procuring an injunction restraining the subletting of the leased premises or any part thereof. The lease contained express authority for underletting. It provides: "The second parties shall have the privilege of underletting any portion of said premises during said term." 6 Lawson on Rights & Rem., secs. 2801, 2843; Wiggins Ferry Co. v. Railroad, 128 Mo. 224; Life Ins. Co. v. Cooper, 162 U. S. 529; Green v. Cole, 103 Mo. 70; Crouch v. Railroad, 22 Mo. App. 315; Shattuck v. Lovejoy, 8 Gray 204; Spear v. Fuller, 8 N. H. 174; Turner v. Stephens, 83 Mo. 218; Jarrett v. Morton, 44 Mo. 275; Harberg v. Arnold, 78 Mo. App. 239. (6) The lessee is a voluntary, unincorporated association, and has no legal entity that

could be sued; the officers and members could have been sued as partners for the rent, but for the fact that Jones & Oglebay made their lease upon the express condition "that no personal liability of any kind is assumed or created upon the part of any officer, director or individual member of the said Board of Trade." Hence, the only promise made by the lessee is in law no promise; it follows that the contract of lease is unilateral and not enforceable for want of mutuality and can not support an action by either party and certainly not by Jones & Oglebay. Heath v. Goslin, 80 Mo. 314; 32 Am. L. R. 419; Vogel v. Peakok (Ill.), 42 N. E. 386; Railroad v. Brinkerhoff, 21 Wend. 139; Lester v. Jewett, 12 Barb. 505; Dorsey v. Packwood, 12 How. 126; Jones v. Durgin, 16 Mo. App. 373; Frye on Specific Performance, p. 214, sec. 440; Waterman on Specific Performance, sec. 196; Mastin v. Halley, 61 Mo. 200; Glass v. Rowe, 103 Mo. 539. Courts do not enforce mere moral obligations. Price v. Kane, 112 Mo. 420.

*Elijah Robinson* and *Stuart Carkener* for respondents.

(1)    The interplea of respondents, Jones & Oglebay, in this case is not, as is assumed by counsel for appellant, the trust company, an effort on the part of the respondents to enforce a contract between the trust company and the Board of Trade. (a)    No such issue is presented by the pleadings. The bill filed by the Board of Trade in this case shows that the contract between it and the trust company had been fully complied with, at least on the part of the board, and this money paid thereunder by appellant is in law the property of the board. The directors of the Board of Trade disclaim a right under the circumstances to retain it, and bring it into court, stating that it was paid to them by appellant as the amount of the rental of respondent's building, and that they hold it subject to the decision of the court as to

whether appellant or respondents are entitled to it. And respondents insist that it is the property of the board and subject to the payment of any debts of the board, and that they, as creditors of the board, are entitled to have it adjudged to them in payment of the Temple Block rental, which otherwise they could not enforce by reason of the provision in the lease exempting the members of the Board of Trade from personal liability.   (b)  If this were an action by respondents to enforce the contract between the Board of Trade and the trust company, under which the board remained in the Exchange Building and appellant paid the $16,000, constituting the fund in question, the trust company could not depend on the ground of rescission because there is no evidence of a rescission of that contract.  On the contrary, said contract has been performed by both of said parties.  It could not be rescinded without the consent of both parties, and there is not the slightest evidence to show that either party desired that it be rescinded.   Claes v. Lehenbenter Co., 65 Mo. App. 507; Feld v. Roanoke Co., 123 Mo. 603; Ludwig v. Knippinger, 13 Mo. App. 593; Jennings v. Gage, 13 Ill. 610; Carter v. Scargill, L. R. 10 Q. B. 564.   (2)   Under the evidence in the case there is not a shadow of doubt that the real contract between the Board of Trade and Jones & Oglebay was that said Board of Trade was to move down to and occupy the Temple Block; but it is claimed by counsel for the trust company that it is not so specified in the written contract, and that the parol evidence offered (whereby that feature of the contract is made so perfectly plain) was not admissible.   (a)   It is well settled that the rule that parol evidence can not be received to contradict or vary a contract in writing, applies only to controversies between the parties, promisor and promisee, in such contract.   Iron Co. v. Green, 88 Fed. 216; 1 Greenleaf, Evidence, sec. 279; Lee v. Adsit, 37 N. Y. App. 78; Wood v. Eastman, 10 N. H. 359, cited in Brown, Parol Ev., p. 35, par. 7; McMasters

v. Ins. Co., 55 N. Y. App. 234; Evans v. Wells, 22 Wend. 345, cited in Brown, Parol Ev., p. 35, par. 6; Cordes v. Straszer, 8 Mo. App. 61; Murphy v. Railroad, 15 Mo. App. 594; Woods' Practice Evidence, p. 105; Venable v. Thompson, 111 Ala. 147; Strandler v. Lembth, 7 B. Mon. (Ky.) 589; Van Emen v. Stanchfield, 10 Minn. 255; Thomas v. Truscott, 53 Barb. (N. Y.) 200; Dempsey v. Kipp, 61 N. Y. App. 471; Pierce v. Johnson, 50 S. W. 610. (b) It is competent to show by parol the circumstances surrounding the parties to the contract, the subject-matter of the contract, and the object aimed at by the parties in making the contract, so that the language of the contract may be understood by the court, as it was by the parties. Wharton's Ev. (3 Ed.), secs. 939-40, note 1, p. 101; Brown, Parol Evidence, p. 179, sec. 53; Bradner on Evidence, pp. 149, 150 and 153, par. 6; 1 Greenleaf's Evidence, sec. 286; Bradley v. The Washington Packet Co., 13 Peters (U. S.) 94; Davis v. Hendrix, 59 Mo. App. 444; Woods' Practice Evidence, p. 72; Ellis v. Harrison, 104 Mo. 279; Broughton v. Null, 56 Mo. App. 231; Deutman v. Kilpatrick, 46 Mo. App. 624; Arnoldia v. Childs, 70 Mo. App. 530. (c) Parol evidence is also competent to show the acts of the parties done in pursuance of and carrying out the lease and in interpretation of it. Ellis v. Harrison, 104 Mo. 270; Brewing Co. v. Water Co., 34 Mo. App. 49; Patterson v. Camden, 25 Mo. 13; Woods' Practice Evidence, p. 73. (3) These respondents, Jones & Oglebay, fully complied with the terms of their contract with the Board of Trade and are, therefore, entitled to the fund in controversy. The Board of Trade could not legally assign the lease to the trust company, and the trust company had no right to demand possession of the premises. R. S. 1899, sec. 4107. It is a conceded principle of law that, when a contract is not performed, the party who is guilty of the first breach is generally the one on whom rests all the liability of non-performance. Anvil Mining Co. v.

Humbel, 153 U. S. 540; Mfg. Co. v. McCord, 65 Mo. App. 507; 7 Am. and Eng. Ency. of Law (2 Ed.), pp. 149-151; Railroad v. Railroad, 135 Mo. 173.   (4)   The fact that by the terms of the lease the officers and members of the Board of Trade were exempt from personal liability, and that the association was unincorporated, so that respondents had no personal remedy against any one for the collection of their rent, constitutes no reason why they should not be entitled to the money in controversy in this case.   A court of equity will not permit the trust company to recover the fund in controversy, but will subject it, as the property of the Board of Trade, to the payment of respondents' claim, since otherwise they would have no remedy.   Harper v. Rosenberger, 56 Mo. App. 388; Reyburn v. Mitchell, 106 Mo. 365; Glasner v. Fredwick, 73 Mo. App. 424; Lindell v. Rokes, 60 Mo. 251; Jones v. Durgin, 16 Mo. App. 274.

MARSHALL, J.—This is an interpleader in equity for $16,467.51.   The plaintiffs compose the board of directors of the Board of Trade, in Kansas City, a voluntary organization.   The appellant is a trust company and was formerly named the Missouri, Kansas & Texas Trust Company, and will be referred to herein as the trust company.   The respondents are George W. Jones and James H. Oglebay, comprising the firm of Jones & Oglebay.   The purpose of the suit is to pay the fund into court and to compel the trust company, and Jones & Oglebay to interplead for it.   They interpleaded for the fund, and on June 30, 1900, by consent of parties, the plaintiffs paid the money—less a fee allowed their attorneys and the costs to that date—into court, and thereupon the court decreed the fund to Jones & Oglebay, and the trust company appealed.

The controversy is this:

Prior to May 31, 1898, the Board of Trade occupied a part of the Exchange Building, on Eighth and Wyan-

dotte streets, of which Richard Gentry was the owner.
Their relations became unpleasant, and the Board of
Trade, and its members, as individuals, who had offices
in the building, determined to move. The defendants
Jones & Oglebay owned a building on Missouri avenue
and Walnut street, called Temple Block, and the Board
of Trade, on May 31, 1898, leased the building from
Jones & Oglebay, for one year, from July 1, 1898, for a
rental of sixteen thousand dollars, with the privilege
of a renewal for five years. . The lessors were to fur-
nish free, heat, water, light and elevator and janitor
service, and to retain the offices then occupied by them.
The lessors were to change ''the four storerooms on the
first floor into one room in complete order for a trading-
room for the Board of Trade, to the satisfaction of the
building committee of the second party, the portion of
the ceiling over the trading-hall corresponding with the
open space above, the main entrance from the hall to the
trading-room to be between the two elevators.'' It was
further stipulated, that, ''The second parties shall have
the privilege of underletting any portion of said prem-
ises during said term, and at its own expense, causing
such changes, by way of partition, or otherwise, as it
may deem proper, under the supervision of one of the
first parties.'' The lease expressed to be, ''upon condi-
tion, however, that no personal liability of any kind is
assumed or created upon the part of any officer, director
or individual member of the said Board of Trade.''

Pursuant to the lease the lessors notified all the ten-
ants then in Temple Block to vacate on July 1, 1898, and
made the changes on the first floor above provided for.
The Board of Trade appointed a committee to fix the
rental of the rooms in the building (Temple Block)
other than those intended to be used by it, and they were
all assigned, by lot, to the members.

The trust company, in June, 1898, acquired title to
the Exchange Building from its former owner, Gentry,
and at once set about to prevent the Board of Trade and

its members from leaving the Exchange Building, and accordingly on June 22, 1898, the trust company made a written proposition to the Board of Trade, that if it would remain in the Exchange Building for a term of five years, the trust company would assume the Jones & Oglebay lease, and in addition would not only charge no rent for the use of the trading-hall or for the rooms used by the secretary of the Board of Trade, but would pay the Board of Trade a bonus of five hundred dollars a month.   Later, on the same day, the trust company further, in order to make sure that the trust company would meet the assumption of the $16,000 rental of the Temple Block, proposed to allow the Board of Trade to collect the monthly rents from the tenants in the Temple Block and keep them until the end of the month, and if the trust company did not pay the rent on the Temple Block within twenty-four hours after it was due, to allow the Board of Trade to apply the rents so collected to the payment of the rent due for said Temple Block.

Afterwards on June 23, 1898, the trust company further wrote to the Board of Trade saying the proposition did not contemplate that all the members then occupying rooms in the Exchange Building should sign leases for five years, and further saying that the lease contemplated was to be without personal liability of the officers or members of the Board of Trade and agreeing to rely upon that same honor of the Board of Trade to keep its promises "as Messrs. Jones & Oglebay relied upon to get their $16,000 for a year, which will most certainly be paid by us and thus relieve the Board of Trade and all its members from any obligation of honor or otherwise to the owners of the Temple Block."

This proposition was submitted to the members of the Board of Trade on June 23, 1898, and was accepted by a majority vote of the members.

Thereupon on June 24, 1898, the trust company wrote Jones & Oglebay as follows:

"Gentlemen: The undersigned having purchased the Exchange Building recently made a proposition to the Board of Trade for rental of portions of said building, and in said proposition agreed to assume the lease which you made to the Board of Trade for the Temple Block for one year from July, 1898. We would like to meet you with a view of ascertaining for what sum we can secure the cancellation of this lease, releasing the lessees from any liability to pay rent thereon. Or in the event that you would not care to negotiate or consider such a proposition, we will, of course, under our promise to the Board of Trade, be obliged to pay the rent and sublet the Temple Block, and get whatever we can out of it.

"If you will kindly indicate a place and time where and when we can meet you and talk over this matter, we would very much like to have you do so."

To this letter Jones & Oglebay never made any reply.

The attorney of the Board of Trade then prepared a lease from the trust company to the Board of Trade, which was executed by the trust company, but while said attorney was reading it to the officers of the Board of Trade, and before it was executed by them, Jones & Oglebay, on June 28, 1898, got out an injunction against the Board of Trade restraining it from assigning or transferring or subletting Temple Block or any portion thereof, except the basement, to the trust company, or to any person other than a member of the Board of Trade or to one engaged in the grain or like business, and also restraining the board from "making any order, passing any resolution, or making any contract which would prevent or tend to prevent the said association (or members thereof) from locating its trading-hall and officers in and otherwise using and occupying plaintiff's said building" (Temple Block). The lease which the Board of Trade was restrained from executing, contained the provisions covered by the propositions of the trust com-

pany—those that related to and bound the trust company to assume the lease of Temple Block, and which gave the trust company any rights under that lease, were as follows:

"4. First party assumes the contract made by the second party on May 31, 1898, with George W. Jones and James H. Oglebay for lease of Temple Block, *and expressly agrees to pay to said Jones & Oglebay the rent therein provided, said first party expressly waiving any and all questions as to the said contract to pay rent not being binding at law.* First party further agrees to indemnify and hold harmless said board, and each and every officer and member thereof, from any loss, damage, costs, attorney's fees and expenses by reason of any failure to comply with said contract as to said Temple Block, and by reason of not moving to Temple Block or by reason of any litigation arising out of or in anywise connected with either of said matters. Provided, however, that in any suit or suits instituted by said Jones & Oglebay against the board, its officers or members, the first party shall be in due time advised thereof, and through its attorneys shall be permitted to have the management and defense of said suits.

"The said first party shall pay the monthly rental on the Temple Block two days prior to its becoming due, and in default thereof the secretary of the board may collect sufficient of the rents of the Exchange Building to pay same, and after making such payment the balance shall be turned over to the first party.

"5. The second party further agrees either to assign to first party its said lease for the Temple Block, or to sublet to the first party or to whomsoever it may designate, portions of said Temple Block as from time to time requested by the first party, and if sublet to assign all rent to the first party, provided, however, that the board of directors of the second party, or its secretary, shall first approve the desirability of the tenant, and provided, further, that all persons now in said

Temple Block shall be accepted as tenants if the first party so desires, it being understood that the first party shall agree and the first party does hereby agree to save the second party, its officers and members, harmless from any and all liability or damages for making any of said subleases.  The first party further agrees to pay the secretary of the second party the sum of twenty-five dollars per month for looking into the question of the desirability of tenants so long as the lease for the Temple Block shall not be cancelled by an agreement between Messrs. Jones &  Oglebay and the Missouri, Kansas & Texas Trust Company, not exceeding, however, one year.''

On July 1, 1898, Jones & Oglebay wrote to the Board of Trade saying that they had made the changes required by their lease in Temple Block and that said building, ''is now vacant and ready for occupancy by your association, and the full possession of the same and every part thereof except such rooms as were expressly excepted and reserved to us by the terms of said lease, is hereby tendered to your association to be used and occupied by them for the purpose of such business as is usually carried on and transacted by your association and the members thereof.  And we hereby demand that you take immediate possession of said building for said purposes in accordance with said contract.''

On the same day the Board of Trade replied to said letter as follows:

''Your letter of July 1, 1898, received.  The Board of Trade of Kansas City, Missouri, demands of you the possession and keys of the building known as the Temple Block, to be delivered to it pursuant to the terms of the written contract of date May 31, 1898.  The Board of Trade denies your right to make any conditional tender, or to change or alter the contract, or to limit any right of use given by it.  Any failure on your part to

comply with the terms of the contract will operate as a forfeiture thereof.''

On the same day Jones & Oglebay wrote to the Board of Trade as follows:

''Replying to your letter of this date, will say that, inasmuch as under the terms of the contract between you and us, we are required to operate the elevator and furnish heat, light, janitor service, etc., and are also entitled to retain our offices in the building we do not very well see how we could deliver to you the keys of the building, and, at the same time, comply with the terms of our contract. However, the keys to and possession of such portions of the building as you are entitled to the possession of, are ready for you at the building, and you can have the same by calling therefor; but the fact of our delivering to you the keys and possession of such portions of said building as you are entitled to under the terms of the contract must not be construed as a waiver, on our part, of our right to have your association occupy our building, or of our rights in regard to any assignment or subletting of said building, or any portion thereof. Those are matters which, if we could not be able to agree in regard to them, must be settled by the courts. It is our intention to fully and fairly comply with the contract on our part, and if, at any time, you should be of the opinion that we are not thus complying with our contract, we would be glad to have you call our attention to the matter and specify wherein our failure consists.''

Nothing more was done by either Jones & Oglebay or the Board of Trade looking towards the latter moving into Temple Block. On August 6, 1898, the temporary injunction was amended so as to restrain the Board of Trade from making any assignment of the lease, and from any subletting of any portion of Temple Block, excepting the basement, to any person not connected with the Board of Trade.

On November 5, 1898, the injunction was made perpetual, and the Board of Trade was enjoined from assigning or transferring the lease of Temple Block or the rights and privileges of the board under the lease to the trust company, either directly or indirectly. But the court found the issues for the defendant, "so far as they relate to the removal to, and occupancy of said Temple Block by said Board of Trade." The Board of Trade appealed from this judgment, and it is represented to this court that the appeal is now pending in the Kansas City Court of Appeals.

The Board of Trade remained in the Exchange Building, and Jones & Oglebay allowed Temple Block to remain vacant during the whole year, and so far as appears from this record made no effort to rent it or any part of it. The trust company was never permitted to occupy or rent out any part of Temple Block. But at the end of each month during the year covered by the lease of Jones & Oglebay to the Board of Trade, the trust company sent a check to the Board of Trade for $1,333.33, and also for the $500 bonus it had agreed to pay the board. Each remittance was in a letter of the following tenor:

"Dear Sir: In order to protect the Board of Trade and not for the benefit of Messrs. Jones & Oglebay, we herewith hand you our check in the sum of $1,333.33, being one-twelfth of $16,000, the amount specified in the lease for the Temple Block, from Jones & Oglebay, over which lease there is now pending controversy. We desire to inform you that we have been prevented by Messrs. Jones & Oglebay, wrongfully as we think, from securing any of the benefits, either directly or indirectly, from the rental of the Temple Block, and we consequently request that you preserve this money so that deductions may be made therefrom, if on final hearing the court of equity decides that Messrs. Jones & Oglebay had no right to restrain the Board of

Trade and the undersigned from subletting portions of said block or otherwise disposing of said lease, and that the whole rent thereof should not be paid to them, but that the whole or portions thereof be returned to the undersigned. We also hand you check in the sum of five hundred dollars, due August 1, on account of your retaining your trading-hall and offices in Exchange Building.''.

The Board of Trade accepted the money so paid, without question, and deposited it in a bank which allowed interest on the deposit.

On March 24, 1899, the Board of Trade filed this suit, making the trust company and Jones & Oglebay defendants, alleging the facts substantially—though not fully—as here stated, and stating that the trust company had sent it a check for $1,333.33 for each month beginning with July 1, 1898, and that it would continue to do so for the months of March, April, May and June, 1899, under the same conditions, and asking leave to pay the fund into court, and that the defendants be required to interplead for it, which the defendants did. On June 30, 1900, the court, by consent of parties, ordered the Board of Trade to pay the $16,000, with the interest it had earned, less a fee for its attorney and certain costs of the case, into court, and that being done the Board of Trade was discharged. No question was made by the parties that at the time this suit was begun the Board of Trade had received only $10,666.68, while the order was to pay the $16,000, with interest into court, and as that was a consent decree this fact will not be further taken into account in this court.

On the same day the court adjudged the fund to Jones & Oglebay. The reasoning upon which the learned trial judge based this finding is best expressed by the following excerpt from his written finding filed in the case, to-wit:

''The payments of the trust company to the Board of Trade were made in pursuance to its contract with the

latter. They were part of the consideration for which the Board of Trade remained in the Exchange Building, and the trust company had no more right to attach any conditions or protests to such payments than it would to the payment of the $500 per month that it made to the Board of Trade for its own use and benefit. It is presumed to know that under the statutes of this State above cited it could acquire no rights under an assignment of the lease to them except by the written consent of Jones & Oglebay thereto, and that Jones & Oglebay had a perfect right to entirely ignore the communication made to them by Mr. Stilwell on June 29, 1898, in regard to such an assignment or to a cancellation of the lease.

"The fund of $16,000 in the plaintiff's possession was acquired and is held under very peculiar circumstances. If the sole consideration for which it was paid by the trust company was the assignment of the lease to it, then Jones & Oglebay ought not, perhaps, to receive any of the fund unless they consented to such assignment, but as above stated, I believe from the evidence that the main consideration was the agreement of the Board of Trade to remain in the Exchange Building, which it has done, and the money having been paid, the contract has been executed and the trust company has no claim upon it. The Board of Trade, I take it, is a partnership, and, while by the terms of the lease, none of the individual members were to be personally liable, still it does not follow that any property or money which the Board of Trade holds as partnership assets might not be. This $16,000 it was agreed by the trust company should be paid by it for the use of Jones & Oglebay, and thus relieve the Board of Trade and all its members from any obligation of honor or otherwise to the owners of Temple Block. (See Stilwell letter of June 23, 1898.) It was creditable to the Board of Trade that it required such a promise from the trust company before it would enter into any agreement with it. The right of Jones

& Oglebay, if any, to this fund does not arise out of any contractual relation with the trust company, for none existed, but comes, if at all, from their right to be recompensed out of any property owned by the Board of Trade, no matter from what source derived.

"Holding as I do that Jones & Oglebay were ready and able to comply with the terms of the lease on their part, that they had discharged all their former tenants; had expended large sums in putting the building in a condition for the use of the Board of Trade and that it remained unoccupied by tenants, for the year for which the lease was to run, I am of the opinion that they are in equity entitled to the entire sum of $16,000, and whatever interest it may have accumulated, less a reasonable attorney's fee, to the attorneys of the plaintiff for filing the bill herein, and a decree in accordance with this conclusion will be entered herein."

From this judgment the trust company appealed.

## I.

Reduced to its last analysis the case made is this: The Board of Trade, a voluntary, unincorporated association had its place of business in the Exchange Building, as did also many of its one hundred and eighty members. The landlord made himself disagreeable to them. So they determined to move. Accordingly the Board of Trade leased from Jones & Oglebay the Temple Block for one year from July 1, 1898, with an option for five years or more, at a rental of $16,000, payable in monthly installments. The lease did not specify for what purpose the building was to be used, nor did it contain any express covenant or condition that the Board of Trade or any of its members should move into it or occupy it. But the lease did require the lessors to change the four rooms on the ground floor into a trading-room for the Board of Trade. The lease expressly granted to the Board of Trade the right to underlet any

portion of the premises, and to cause any changes it desired, by way of partition, or otherwise, to be made, and provided no limitation as to the tenants or the business to be carried on therein. The lessors made the changes required by the lease and notified the tenants then in the building to vacate, and the lessee appointed a committee to apportion and rent the offices in the building that would not be needed by the board, and the members of the board were the tenants contemplated and arranged for.

This arrangement involved the Board of Trade in a liability (moral only, for all personal liability of the officers and members was expressly excluded by the terms of the lease) to pay sixteen thousand dollars a year rent for Temple Block, and to run the risk of making itself whole by subletting offices in the building.

Before the first of July arrived, however, the trhst company became the owner of the Exchange Building, and it at once set about to prevent the Board of Trade and its members from leaving that building, and to this end it proposed to let the Board of Trade have the free use of the trading-room and certain rooms for its secretary, for a term of five years, and in addition to *assume* the lease on Temple Block, and to pay the Board of Trade a bonus of five hundred dollars a month for staying in the Exchange Building. Also to exempt the officers and members from all personal liability (inasmuch as the board was not only given rent free but also a bonus of five hundred dallars a month, this exemption amounted to nothing, practically) and further to take the risk of the members of the board renting offices in the building.

This arrangement secured to the Board of Trade quarters rent free and a bonus of six thousand dollars a year, without running any risk of paying rent and making itself whole by subletting the building. Of course, this was a much more favorable arrangement to the Board of Trade than the renting of the Temple Block

was, and it is not at all surprising that the board accepted it.

On the other hand, it is not at all surprising that Jones & Oglebay were disappointed and vexed, nor that they felt angered at the trust company, as plainly evidenced by their refusal to answer the trust company's letter of June 24th, and by completely ignoring them, and by the institution of the injunction suit to prevent the Board of Trade from assigning the lease or subletting to the trust company.

It is also not surprising that the trust company should desire to keep the Board of Trade in the Exchange Building, for it made the building and the surrounding property (in which the trust company appears also to have had an interest) more valuable and easier rented.

Self-interest, manifestly, prompted and moved all of the parties to act as they did. No other motive is apparent or shown. Each move the several parties made in the matter was to advance their own interests. Naturally, all parties seized every chance that seemed to be in furtherance of their interests. The usual result followed—there was much invoking of supposed technical rights. The letter of the 24th of June from the trust company to Jones & Oglebay informed them that the trust company had purchased the Exchange Building, and procured the Board of Trade to remain there, and that the trust company had assumed the lease of the Temple Block, and desired to know on what terms they could secure its cancellation, or if that could not be agreed upon, they would pay the rent and get what they could out of the building by subletting it.

Jones & Oglebay did not answer this letter, but, on the contrary, procured an injunction against the Board of Trade, restraining the board from assigning or subletting the Temple Block or any part of it to the trust company, and also restraining the Board of Trade from subletting any part of it to any one except members of

the board or persons engaged in the grain or other like business.   Jones & Oglebay thereafter on July 1st, notified the board that Temple Block was ready for occupancy and tendered it to the board "to be used and occupied by the members thereof for the purposes of such business as is usually carried on and transacted by your association and the members thereof.   And we demand that you take immediate possession of said building for said purpose, in accordance with said contract."

This qualified tender was not justified or warranted by the lease, for as the court finally found in the injunction case, the lease did not obligate the Board of Trade to move into or occupy the Temple Block, and the lease contained an express power to sublet, but did not limit or restrict this to subletting to the members of the board or persons engaged in the grain trade or like business. On the contrary, under the lease the board had full power to sublet any part of the building to any one it saw fit and for any purpose it chose.

The tender of July 1, 1898, therefore, amounted to nothing in law, and the board was perfectly right, by its answer of that day, in refusing to accept a conditional tender, and in demanding possession. Of course that demand was meant and must be understood in the light of the lease, and did not include the rooms reserved by the lessors.   The answer of Jones & Oglebay to this letter, called attention to their right to occupy the rooms and to their duty to furnish light, heat, power, janitor and elevator service, and properly said that for that reason they could not turn possession or the keys to the whole building, but tendered such possession and keys to such parts of the building as the lease of the Board of Trade gave the board a right to, but coupled this with a provision that it was not to be taken as a waiver of their claim that the Board of Trade must occupy the building itself and must not assign nor sublet the building or any part of it, and saying these matters must be settled by the courts.

For the reasons already given as to the first tender, this tender was also unwarranted and insufficient, and of no legal effect. For it was conditional and denied valuable rights to the board which were granted by the lease, but which Jones & Oglebay had effectually deprived them of, by procuring the injunction.

The matter therefore finally resolves itself into this: The Board of Trade leased the Temple Block for a year, for $16,000, but without personal liability of any of its officers or members, and without any provision in the lease requiring the board to move into it or in any manner restricting or specifying the use that could or should be made of it, but with express power of subletting, no person or character of business being specified.

The trust company *assumed* this lease, and tried to secure its cancellation or to take possession and sublet as best it could. Jones & Oglebay's only answer to this was to procure an injunction against the board restraining it from assigning or transferring the lease or subleting any part of the building to the trust company. It will be observed that the temporary injunction was much broader than the peremptory injunction, but both completely prevented the trust company from enjoying, directly or indirectly, any right or privilege under the lease.

So that Jones & Oglebay took away a clear and unquestionable right that the board had, under their lease, to sublet either the whole or any part of the building to the trust company, and the trust company was deprived of the only benefit that it was possible for it to enjoy under the lease, and which formed a part (whether the principal or only the incidental is wholly immaterial), of the consideration to the trust company of its agreement to assume the lease.

In other words, Jones & Oglebay have clearly failed to live up to the obligations of their lease to the Board of Trade and, on the contrary, were guilty of a breach of it

when they procured the temporary injunction prohibiting the board from subletting to the trust company, and yet they claim rent for the whole term of the lease. They do not claim it from the trust company, because they claim there never was any privity of contract between them. They do not rely upon the promise of the trust company to the board to assume the lease and to pay the rent, for if they did, they would have to ratify and confirm the agreement between the trust company and the board, and this they have always refused to do, and the trial court properly held that Jones & Oglebay are not entitled to this fund by reason of any contractual relation.

But while Jones & Oglebay admit that they could not sue the officers or members of the Board of Trade for the rent reserved, and could not sue the trust company for the rent, because of the agreement to assume the lease, and while the trial court held that both of these propositions are true, still Jones & Oglebay claim that the money turned over every month by the trust company to the Board of Trade constituted a trust fund for their (Jones & Oglebay's) benefit, and therefore they are entitled to the fund. The trial court, however, after falling into the error of stating that that money was agreed by the trust company to be paid "for the use of Jones & Oglebay," and into the further error of holding that the trust company had no right to attach any conditions or protests to the money when it was turned over each month to the Board of Trade, and after holding that Jones & Oglebay could not maintain an action for the rent against the members of the Board of Trade, because they were expressly exempted from liability, nor against the trust company because there was no privity of contract between them and the company, held that the fund was the property of the Board of Trade, and as partnership assets, could be applied to the payment of the rent, notwithstanding the partners could not be held liable for the rent.

The trial court was in error in holding that the trust company paid this money to the Board of Trade for the use of Jones & Oglebay, and was also in error in holding that the trust company had no right to impress conditions or limitations on the money when it paid it to the Board of Trade.

The contract of the trust company with the Board of Trade was to *assume* the lease on the Temple Block, and to make it certain that the company would pay the rent, the Board of Trade was given power to collect every month enough rents from the tenants in the building to cover the month's rent and if the trust company did not pay the rent to Jones & Oglebay within twenty-four hours after it was due, the board was authorized to apply the rents it had thus collected from the subtenants to the payment of the rent to Jones & Oglebay, but if the trust company did pay the rent, then the board was to turn over the rents it had so collected to the trust company.

This arrangement did not contemplate that the trust company should pay the rent to the board "for the use of Jones & Oglebay" and that the board should turn it over to them. So there is no evidence to support the hypothesis upon which the trial court proceeded in holding that the trust company agreed to pay the money to the board "for the use of Jones & Oglebay."

The contract of the trust company with the board (consisting of the propositions of June 22d and 23d, which were accepted by the board) did not require the trust company to turn over the $1,333.33 every month to the board, nor was the trust company under any legal obligation to do so. The board could only require the trust company to pay it to Jones & Oglebay, and if they did not do so could proceed against the trust company on its contract. Nor was the trust company under any legal obligation to protect the board or its members from loss by depositing this much money with the board every month. The trust company was under a legal as well

Vol 173 mo—16

as a moral obligation to the Board of Trade to protect it from loss on account of the Jones & Oglebay lease, but the trust company was under neither a legal nor a moral obligation to deposit with the board any sum whatever in advance of any loss suffered by the board, nor as an indemnity against such loss. The monthly deposits made by the trust company with the board were therefore voluntary. Being voluntarily made and the money being the money of the trust company, that company had a right to impose any terms or limitations or conditions upon the funds and the board's custody of the funds, that the trust company saw fit. The trust company did expressly impose the conditions upon the deposits that they were made "in order to protect the Board of Trade and not for the benefit of Messrs. Jones & Oglebay," and notifying the Board of Trade that Jones & Oglebay had wrongfully prevented the trust company from securing any benefits, either directly or indirectly, from the rental of the Temple Block, and directing the board to hold the fund until the courts could decide whether Jones & Oglebay had a right to enjoin the assignment of the lease or the subletting of the premises.

Thus the money was deposited by the trust company as an indemnity to the board against loss. It was in no sense a trust fund for the benefit of Jones & Oglebay, and such an idea or right was expressly excluded by the terms of the deposit. The board was not bound to accept the deposit of the money, but if it accepted it, it could only do so subject to the terms and limitations impressed upon it by the trust company. If the board had not been willing to so take the deposit, it could and should have refused to accept it on those terms. But the board accepted the deposits just as made. The money, therefore, at all times remained the money of the trust company, held by the board as an indemnity against loss. The trial court was, therefore, in error in holding that the trust company had no power to impose any conditions upon the deposits or fund, and that the

fund belonged to the board, and could be applied by the court to the payment of the rent under the lease from Jones & Oglebay to the Board of Trade, notwithstanding the members of the board were not personally liable. The money was at no time a trust fund for the benefit of Jones & Oglebay, nor was it at any time the partnership property of the Board of Trade so that it could be sequestered and applied either at law or in equity to the payment of the rent under the lease of Temple Block. It was at all times the property of the trust company, and could only be used by the board to pay any obligation or liability the board was under to Jones & Oglebay under said lease.

Jones & Oglebay could not attach or seize or reach the fund in law or in equity to satisfy any claim they might have against the Board of Trade, for it was the property of the trust company. Neither could Jones & Oglebay claim or recover anything from the trust company, for there was no privity of contract or estate between them, without Jones & Oglebay ratified the contract between the trust company and the board, and that they refused at all times to do.

The premises being true, the fact that the board paid the money into court, even by consent of the parties, did not change the character of the fund, the relations of the parties nor the rights of the parties respectively as to the fund. It was money of the trust company that was paid into court, not the money of the board or of any one else. There was no apparent reason or pressing necessity for the board to take the matter into court at all, and less so for so doing four months before the expiration of the lease and before it had the whole fund in its possession. If the board did not desire to hold the money as an indemnity, there was nothing to keep it from returning it to the trust company.

The case might be allowed to rest here. But there are other contentions which deserve attention and adjudication.

## II.

It is perfectly apparent that it was the intention of the Board of Trade to move into the Temple Block and establish its trading-rooms there, and it was likewise its expectation and intention to sublet the offices in that large building, and doubtless it expected that the members of the board would be the subtenants. It is also the fact that Jones & Oglebay expected this would be done. But no such obligation, limitation or restriction was embodied in the lease, and such intentions or expectations do not create any such rights. [Morgan v. Porter, 103 Mo. 135.] On the contrary, the lease did not require the board to use or occupy or so use the building, nor was there any express or implied limitation upon the power conferred by the lease upon the board to sublet the offices in the building.

This being true. the board had a right to sublet to whom it chose and to use the building for any purpose it saw fit or not to use it at all. [Taylor v. Moffat, 2 Blackf. 304; Howard v. Ellis, 4 Sandf. 369; Mayor v. Pattison, 10 East 136; Brouwer v. Jones, 23 Barb. 153; De Forest v. Byrne, 1 Hilt. 43.]

Ordinarily, any lease may be assigned or transferred unless the power to do so is expressly denied by the terms of the lease. [Taylor's Landlord and Tenant (8 Ed.), secs. 16, 402 and 426.] But under our statute (sec. 4107, R. S. 1899) a tenant for a term not exceeding two years, or at will or by sufferance, is prohibited from assigning his term or interest without the written consent of the landlord. As to all other terms or holdings, the power to assign is an incident to the lease and may be exercised by the tenant, unless expressly prohibited by the terms of the lease.

But even conceding that the board had no power under the statute to assign this lease (and this is by no means free from doubt, because of the option for five years in addition to the one year term specified in the

lease), nevertheless the board had a right to sublet any part of the premises, both under the general law and by the express terms of this lease. [Taylor on L. and T. (8 Ed.), secs. 108, 109, 403.]    This right exists even where the lease contains an express prohibition against assignments.    [Idem, sec. 403.]    For there is an essential difference between an assignment and a subletting. [Idem, sec. 16.]

. In this instance, both the parties expected that the board would realize enough by subletting the offices in the building to totally or largely pay the rent it had agreed to pay.    This was a most valuable right.    When the trust company assumed the lease, a part of the consideration for carrying the burden of paying the rent, was the right to recoup the loss by getting the rents from subtenants.    Jones & Oglebay were advised of this fact and prevented it from accruing to either the board or the trust company by procuring the temporary injunction, restraining the board from assigning or subletting the lease to the trust company or to any one else except its own members or persons engaged in the grain or like business, and by securing the permanent injunction prohibiting the board from assigning or transferring the lease, or any rights or privileges of the board under the lease (which, of course, covered the right of the board to sublet) to the trust company. Having taken this stand and refused to allow the board or the trust company to occupy the building (except the basement) or to sublet any part of it for any other purpose than as a trading-room or to its members or persons engaged in like business, they have no right to claim the rent reserved.    Such conduct on their part constituted a breach of the lease and they lost all right to hold any one or any one's property for the rent, and it is for their own wrong they must suffer.    [Anvil Mining Co. v. Humble, 153 U. S. 540; 7 Am. and Eng. Ency. of Law (2 Ed.), p. 149.]

For these reasons the judgment of the circuit court is reversed and the cause remanded with directions to that court to enter a decree adjudging the fund with the interest accumulated thereon, to the trust company, and to adjudge all the costs of the case against Jones & Oglebay.

. All concur.