**SOUTHERN REAL ESTATE AND FINANCIAL COMPANY, Plaintiff–Appellant,**

v.

**The CITY OF ST. LOUIS, et al., Defendants–Respondents.**

No. 51632.

Missouri Court of Appeals, Eastern District, En Banc.

July 19, 1988.[1]

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 7, 1988.

Application to Transfer Denied Oct. 18, 1988.

---

1. This case was originally handed down on June 9, 1987, and transferred to the Supreme Court upon certification by the dissenting judge that it was in conflict with three prior cases. On Octo-

ber 1, 1987, the Supreme Court entered the following order:

"Failing to perceive the conflict of cases suggested by the certifying judge, the Court orders this case retransferred to the Missouri Court of Appeals–Eastern District."

We then reissued the original opinions of June 9, 1987, deleting therefrom only the language of certification in the dissent. Plaintiff filed a motion for rehearing en banc which was granted. With some modifications we now reissue the original majority opinion of June 9, 1987.

Donald Beimdiek, St. Louis, for plaintiff-appellant.

James J. Wilson, Duane Ray Vaughan, Charles A. Seigel, Edward J. Hanlon, St. Louis, for defendants-respondents.

SMITH, Judge.

Plaintiff, Southern Real Estate and Financial Company, appeals from a judgment declaring that defendant, City of St. Louis, as a lessee was authorized under its lease to demolish a parking garage on the leased premises. We affirm.

Southern is the owner of the property. In 1953 it leased the property to Wayco Petroleum. The property comprises two-thirds of city block 131 bounded by Chestnut, Seventh, Sixth, and Market Streets in downtown St. Louis. It is located in the Gateway Mall which is being gradually developed by the City and private developers. The lease called for a fixed rental of $50,000 per year. No other rental is provided for. Its initial term was twenty-five years and six months. There were provisions for three successive renewals of 25 years each. In order to be entitled to exercise the first renewal (and therefore the subsequent ones) the lessee was required to make improvements (exclusive of resurfacing) costing at least $150,000. The lease provided the lessee with the "right at any time and from time to time .. without the consent of lessor" to sublet or assign the lease. Pursuant to this provision Wayco assigned the lease to May Department Stores (also a defendant herein) and Southern released Wayco from further liability.

In 1954, May constructed an underground garage on the leased premises at a cost of $306,000. In 1978, May exercised its right of renewal. In August 1982, May transferred its lease to the City. In the instrument of assignment May expressly stated its obligation to pay the rent if the City failed to do so. Revenue from the garage was sufficient to meet the rental obligation. The City continued to operate the garage until March 1986 when this suit was filed.

In the interim, after May's assignment of the lease and prior to this litigation, the City and Southern had been in communication regarding the rumored destruction by the City of the parking garage. Southern advised the City that the lease prohibited such destruction and proposed that the parties jointly bring a declaratory judgment to determine the legal interpretation of the lease. This was not done. Southern then filed its action for declaratory judgment and an injunction to prohibit the destruction of the garage and the construction by the city of a public park including an open air amphitheater. The City filed an answer and counterclaim which sought a declara-

tion that City had the right to demolish the garage, that the City could use the leased premises for any lawful purpose, and could construct any lawful improvements on the premises. The trial court refused Southern's request for a temporary restraining order and two days before commencement of the scheduled hearing on plaintiff's petition and defendant's counterclaim the City commenced destruction of the garage. Southern then served a notice of termination of the lease, filed an unlawful detainer action against City in Associate Circuit Court, and dismissed without prejudice its declaratory judgment and injunctive relief petition against City.[2] The trial proceeded on City's counterclaim. The trial court entered extensive findings of fact and conclusions of law upholding the right of City under the lease to demolish the garage and to erect its proposed improvements and declaring the lease in full force and effect. This appeal followed.

Southern has raised five contentions of error on appeal. One challenges the trial courts finding of express authorization in the lease for City's action, one raises statutory waste, one raises equitable waste, one challenges the "radical change in use" of the premises, and one challenges the finding that the lease was not terminated by City's actions. All of the contentions, however, are reduced to a determination of whether the lease authorizes the City's actions.

As we stated in *Crestwood Plaza, Inc. v. The Kroger Co.*, 520 S.W.2d 93 (Mo.App. 1974) [1, 2] quoting from *Leggett v. Missouri State Life Ins. Co.*, 342 S.W.2d 833[11–12] (Mo. banc 1960):

"If the terms of a contract are clear and unambiguous the contract will be enforced or given effect in accordance with its terms, and without resort to construc-

tion to determine the intention of the parties. ... When the language of a contract is plain, there can be no construction because there is nothing to construe."

We turn to the provisions of the lease. The lease provides for a fixed rent ($50,-000) for every year of its potential 100 year term. There is no provision for increase of that amount based upon income generated. It further provides:

"At any time and from time to time during the demised term *and any extension thereof,* Lessee shall have the right (but shall not be required) *to erect* on the demised premises at its own cost and expense such improvements, if any, *in such form, size and character,* at such cost and *for such uses and purposes as Lessee shall determine,* provided the same shall comply with all laws and ordinances. Any and all improvements may at Lessee's option cover portions or all of the demised premises and may constitute an integral part or parts of a building or buildings or other structures covering the whole or any part of one or more parcels of adjoining premises." (Emphasis supplied).

Because the extension provision is only available if an improvement occurs prior to the end of the original term, it is obvious that this provision authorizes construction after the original improvement. By its express language it authorizes erection of improvements at anytime during the lease term in a form, size and character and for the uses determined solely by the Lessee. The only restriction imposed is that the improvement must comply with the laws and ordinances. No contention is advanced here that City's intended use is unlawful. The lease further provides:

2. May Department Stores was a defendant in plaintiff's action and has remained a party throughout. It has taken a position in support of the City. The issues before us deal with City's rights under the lease and we will treat City as the primary lessee and defendant. Pride Redevelopment Company and Gateway Mall Associates I were allowed to intervene in the court below on the basis that their development of neighboring land was based upon City promises

that the leased premises would be developed as open space and they would suffer irreparable harm if Southern is allowed to prevent such development. They raised estoppel and laches against Southern. In the view we take of this case it is unnecessary for us to deal with intervenor's intriguing contention that their contractual relationship with the City can be enforced by denying Southern whatever rights it might have under the lease.

"Lessee shall maintain the leased premises in good condition and repair, ordinary wear and tear excepted, at its own cost and expense and *may at any time* and *from time to time* at its own cost and expense *reconstruct, alter or replace any improvements* then existing *in such manner as Lessee shall desire.*" (Emphasis supplied).

■ This provision again is unlimited as to when and in what manner the Lessee may make improvements to the leasehold. As we held in *Crestwood Plaza Inc. v. Kroger Co.*, supra, [7–14] absent express restrictions, a lessee is free to use the premises in any lawful manner. A restriction or covenant will not be implied merely because without it the contract would be unwise. The parties negotiated the lease and intentionally imposed as a restriction only that the use be lawful. We do not rewrite contracts to supply a negative covenant. *So–Good Potato Chip Co. v. Frito–Lay, Inc.*, 462 F.2d 239[4, 5] (8th Cir.1972).

■ Southern attacks this result on several theories. Initially it contends that the requirement of improvements in order to generate the extensions was placed in the lease to protect lessor's reversionary interest in those improvements and that reversionary interest is damaged by the City's actions. It is logical to assume that the entire renewal provision was included so that the lessee could make improvements with the knowledge that it could utilize the leasehold and the improvements for at least 75 additional years after the initial term. In that sense the renewal provision is a protection to both the lessee and the lessor. If the renewal provision is separated into two parts, i.e. extension and improvement, then separate benefits can presumably be found. It is difficult to believe that the reversionary interest was a prime concern of this provision in view of a minimum expenditure of $150,000 to be utilized over as much as a 100 year period. The lease provides that subsequent damage or destruction or deterioration of the improvements shall not affect the lessee's options to renew. There is an exception that if damage or destruction occur from fire or casualty, lessee is required to restore to the leased premises improvements of a value at least that of the depreciated value of the improvements damaged or destroyed. Lessee is required to maintain insurance for that purpose and required to utilize that insurance "to the restoration of such improvements or to the erection of new improvements, as Lessee may elect." Lessee has no obligation to restore or replace improvements which have deteriorated as the result of wear and tear and depreciation or obsolescence. The lease specifically provides that at the expiration of the lease "as extended" the improvements "if any" revert to the lessor. These provisions clearly evidence the signatories' recognition that there might be no improvements of value extant at the time of reversion.

But to the degree that the extension requirements may have been intended to protect the reversion, it is clear that the signatories did not attempt to delineate the nature of the improvements required other than their cost. The only limitation on the quality of the improvement necessary is that it must constitute more than resurfacing. Southern makes no contention that City's development plan is only resurfacing. The lease does not require that the improvement be commercial nor does the lease at any point reflect it is a commercial lease or that the use thereunder be commercial.

Southern also contends that the court's order authorizes demolition but does not require replacement. We do not so interpret the order. The order authorized demolition and replacement of the demolished improvement with City's planned development costing several million dollars. Obviously demolition and replacement cannot occur simultaneously. If the City fails to go forward with its planned improvement Southern can at that point seek its remedies under the lease.

■ Southern also charges the City with statutory waste, Sec. 537.420 RSMo 1986, and equitable waste. Neither contention finds support in the lease. The statute allows as a defense that the tenant had a "special license in writing to do" waste.

Such license can be established by the lease itself. *Lustig v. U.M.C. Industries, Inc.,* 637 S.W.2d 55 (Mo.App.1982)[13, 14]. The land as originally leased was vacant. The lease authorized improvement and replacement of improvements at any time and from time to time. The lease was for a lengthy term and obviously was intended to provide great flexibility to the lessee in the use of the leasehold. These are relevant considerations in regard to the question of waste. *Id.* [12]. What we have previously said establishes that the lease itself authorizes what the City has done and proposes to do. In essence the lease establishes what the lessee may do with the property, and that which is authorized by the lease is by definition either not waste at all or at most is waste authorized by the lessor.

" 'Equitable waste' is a nebulous term—a doctrine of obscure limitations. It is such as is cognizable only in a court of equity. It is said that it has reference to cases where, by the terms of the will, deed, settlement or lease, the tenant holds the land without impeachment of waste....

Thus it is that equitable jurisdiction in this behalf seems to have been confined to wanton, malicious and unconscientious acts of the particular tenant injurious to the inheritance, in contravention of the presumed will of the creator of the limited estate." *Camden Trust Co. v. Handle,* 132 N.J.Eq. 97, 26 A.2d 865 (1942) [14–23].

We are unable to conclude that the evidence supports the conclusion that the City's actions and proposed use of the land meet that criteria. The city is a permissible tenant under the lease. It proposes to expend a substantial amount of money to create an aesthetically pleasing park environment where people can gather and relax and where performances can be held. It is difficult to conclude such use by a city can be termed "wanton, malicious, and unconscientious." This is particularly true in view of the broad and elastic authority for use found in the lease. *Camden Trust,*

supra, is cited by 93 C.J.S. Waste § 1 as holding that the equitable waste doctrine is applicable where the party aggrieved has equitable rights only as with a contingent remainderman or trust beneficiary. Southern's rights are legal, not equitable, and are governed by the terms of the legal contract with City. We find the equitable waste doctrine inapplicable here.

■ Southern also challenges the conclusion that what the City proposes is an "improvement." This argument is in turn based upon Southern's premise that the lease contemplates commercial use of the premises. It does not. Any use not unlawful contemplates uses both commercial and otherwise. The signatories could have limited the use to commercial activities if they so intended. They did not include that word in the lease in specifying the use to be made of the premises, and we are not authorized to engraft that which they omitted. There is no basis for concluding that this lease was intended for commercial use only. Lessor was to receive a basic rental amount whether or not the property was improved. That amount does not vary regardless of whether improvement is made on the premises or what the nature of any improvement is. An improvement serves only to extend the term of the lease, it does not affect the return to the lessor. In that posture, and under the express terms of the lease, whether lessee's construction is an improvement is in the discretion and the eye of the lessee. The lease requires only that any replacement of an improvement by lessee be an improvement over the original condition of the land as a vacant lot, not over the original improvement. The City's planned development meets that test.[3] *State ex rel. Curators of the University of Missouri v. Neill,* 397 S.W.2d 666 (Mo. banc 1966)[2]; *Forum v. Columbia Theater Co.,* 20 Wash.2d 685, 148 P.2d 951 (1944)[3].

■ Southern also contends that what the City proposes to do is not a "replace-

---

**3.** We find it unnecessary to discuss whether the City's proposed structure is capable of revenue production as nothing in the lease requires that it be so capable. We do note that the trial court, on conflicting testimony, found the facility suitable for commercial use.

ment" and therefore not authorized by the lease. Words used in a written lease are interpreted according to their ordinary meaning unless defined in the instrument itself. *Hargis v. Sample,* 306 S.W.2d 564 (Mo.1957)[2]. This lease contains no definition of "replace." The word is not ambiguous. *Adams v. Covenant Security Insurance Co.,* 465 S.W.2d 32 (Mo.App.1971)[1]. It means to take the place of as a substitute or successor; to put something new in the place of. Webster's Third New International Dictionary. City's proposed development meets that definition. The lease does not restrict the lessee to "replacing" with the same or similar improvement. It authorizes improvements at any time and from time to time in such form, size and character and for such uses and purposes as lessee shall determine. Lessee may replace any improvements then existing in such manner as it may desire. It cannot be forgotten that this lease is potentially for a century. The signatories were aware of that and they obviously drafted the lease to allow maximum flexibility to the lessee in the use of the property. It may well be they did not contemplate the use to which the City intends to put the property. But the document as drafted, and which we must apply, does not prevent and in fact

authorizes the development planned by the City. We find no breach of the lease.[4]

The judgment is affirmed.

REINHARD, STEPHAN, SATZ, CARL R. GAERTNER and GRIMM, JJ., concur.

CRIST and CRANDALL, JJ., concur in result only.

DOWD, J., dissents in separate opinion and concurs in separate dissenting opinion of PUDLOWSKI, C.J.

KELLY, J., dissents and concurs in separate dissenting opinion of DOWD, J.

PUDLOWSKI, C.J., dissents in separate dissenting opinion and concurs in separate dissenting opinion of DOWD, J.

SIMON and KAROHL, JJ., dissent and concur in separate dissenting opinions of PUDLOWSKI, C.J., and DOWD, J.

GARY M. GAERTNER, J., dissents.

DOWD, Judge, dissenting.

I respectfully dissent.

4. Some other matters raised in the dissents warrant comment. The only evidence of a tax deduction is from the deposition of *Southern's* vice-president read into evidence by the intervenors in support of their theory of laches. The question and answer were: "Q. Well, from reading the newspaper articles, did you become aware that the purpose of the donation, at least as reported in the newspapers, was to—so that the City could develop that as an open and accessible park area. A. Right, and they would get a $5 million tax deduction." The newspaper article referred to said nothing about a tax deduction only that the gift was estimated to be worth $4 to $5 million. If offered as proof of a tax deduction, the evidence is inadmissible as double hearsay. It was not offered for its truth, but to establish Southern's awareness of the transaction.

We have not considered the question of whether this is a "prime tract" of real estate as relevant to our decision. Today it is prime. In 1953 it was not. It was located in a depressed section of the city bordering on a "tenderloin" district containing deteriorating structures and transient hotels. The Gateway Arch was not under construction and the stadium was not

even in the discussion stage. The lease and the condition of the neighborhood would indicate that the owner was primarily interested in obtaining the best yearly income it could from an undesireable piece of real estate. It did not anticipate the dramatic rebirth of the downtown St. Louis area which viewed in hindsight makes the lease less desireable to the landowner than originally thought.

We also find nothing in the lease that the land was to be used as a parking facility. It was to be rendered into a vacant lot by the lessor (the reason for the demolition provision) for such use as the lessee desired or for no use at all as long as the rent was paid. The unlimited assignability to anyone at the sole discretion of lessee does not evidence any particular contemplated use; it indicates rather the contrary.

If a detriment exists to the reversionary interest because a part of the improvement is on adjoining land owned by the City such detriment was fully contemplated by the signatories who specifically authorized the improvements "at the Lessee's option" to be an "integral part or parts of a building or buildings or other structures covering the whole or any part of one or more parcels of adjoining premises."

The real issue presented by this case is whether an assignment tenant may destroy a parking garage located on the leased premises costing $306,000 to build in the 1950s and grossing a yearly income exceeding $400,000 and construct in its place a nonrevenue producing open park area complete with sunken amphitheater and adjacent reflecting pool with fountain, thus requiring the landlord to expend considerable sums to restore the property to a commercial use upon termination of the lease term.

I would hold the City has breached the lease by removing the landlord's reversionary interest in the parking garage and constructing a public park in its place. Further, the lease agreement does not constitute a license in writing to commit waste in accordance with Missouri's anti-waste statute. Even if the lease could be so construed, however, the assignment tenant City of St. Louis' (hereinafter City) actions would still amount to equitable waste.

The subject property is the proposed westward extension of Kiener Plaza in the Gateway Mall[1] area of downtown St. Louis. The lease for the property was executed on April 15, 1953 by two commercial parties, landlord Southern Real Estate and Financial Company (hereinafter Southern) and tenant Wayco Petroleum Company (hereinafter Wayco), a well-known operator of parking garages. The lease property comprises a prime tract of downtown St. Louis commercial real estate bounded on the north by Chestnut Street, on the south by Market Street, on the east by Sixth Street, and on the west by Seventh Street.

The initial term of the lease was to run twenty-five years and six months with an expiration date of October 31, 1978. Tenant was given an option to renew the lease for three twenty-five year terms on the condition that tenant construct improvements to the property during the initial term of no less than $150,000 exclusive of resurfacing. The lease required the landlord to remove an existing parking garage located on the premises and provide tenant with a level lot ready for building. This provision created a land lease unless and until tenant constructed improvements during the original term. A yearly rental of $50,000, without escalation, was provided for the duration of the original term. Upon expiration of the lease, all improvements made to the property were to revert to landlord Southern. The reversionary interest in the improvements was consideration in addition to rent during the extended term(s) of the lease.

Immediately following execution of the lease, Wayco assigned its interest as tenant to May Department Stores Company (hereinafter May). Prior to 1955, May constructed an underground parking garage with surface parking on the property at a cost of $306,000. On April 4, 1978, May notified Southern of its intention to exercise the first lease renewal term to continue through October 31, 2003, and presented documentation that it had exceeded the requisite dollar figure for improvements.

In August 1982, May donated its lease interest to the City of St. Louis. May valued the gift at five million dollars. It took a tax deduction in that amount as a result of the donation. For over thirty years following the execution of the original lease the premises remained in operation as a parking garage and the City continued to operate the garage, which grossed an annual revenue in excess of $400,000. This terminated when City destroyed the garage in March 1986.

Plans for the destruction of the leasehold improvement formed in October 1982, when the City entered into a written agreement with Pride Redevelopment Corporation (hereinafter Pride), the redeveloper of the Gateway Mall area under the plan, whereby the City agreed to cooperate with Pride in converting the subject property to an open space consistent with Kiener Plaza to the east. Pride in turn, entered into a "Parcel Development Agreement" with Gateway Mall Associates One, owner of the property immediately west of the leased premises, whereby Pride committed itself

1. The Gateway Mall Area is that tract bounded on the north by Chestnut Street, on the south by Market Street, on the east by Sixth Street, and on the west by Tenth Street.

to develop the subject property as a publicly accessible open park space.

Landlord Southern, after hearing reports of the proposed use of the property and objecting to the destruction of the existing parking garage, proposed that the City join Southern in seeking declaratory judgment interpreting the lease. The City refused. Thereafter Southern brought suit seeking declaratory judgment interpreting the lease and an injunction to prohibit demolition of the garage. Southern also sought a temporary restraining order to prevent the City from demolishing the garage. The trial court denied Southern's request for a temporary restraining order and set trial on the merits for March 27, 1986. Two days before the date set for trial, the City, in a strategic attempt to deny Southern any functional relief from a favorable ruling on the merits, demolished the underground parking garage. Southern responded by sending to City notice of termination of the lease.

Finding its suit to be moot, Southern dismissed its action without prejudice. Thereafter, Southern filed an unlawful detainer action against the City to recover possession of the property. The City counterclaimed for declaratory judgment interpreting the lease. The trial court entered judgment for the City declaring the lease in full force and effect. It also found the lease gave the City as tenant the right to remove the garage and erect other "improvements" in its place. The court determined Southern's reversionary interest was limited to the new "improvements," a non-revenue producing open park area with reflecting pool and sunken amphitheater.

The trial court erred as a matter of law in determining the public park area was an "improvement" within the terms of the lease. The City breached the lease by removing Southern's reversionary interest in the parking garage and by constructing a public park in its place. By removing the parking garage and constructing a public park, the City has denied Southern the benefit of the additional consideration necessary for extension of the lease.

All parties agreed at oral argument that the lease is clear and unambiguous. It is the duty of the court to interpret an unambiguous contract. *Thurman v. K.L. Koenig Realty Co.*, 423 S.W.2d 196, 200 (Mo.App.1967); *Adzick v. Chulick*, 512 S.W.2d 194, 197 (Mo.App.1974). The cardinal rule of interpretation of a contract is to ascertain the intent of the parties and to give effect to that intention. *Id.* In that regard, the intention of the parties must be determined at the time the contract was executed, *Schwartz v. Continental Casualty Co.*, 705 S.W.2d 494, 497 (Mo.App. 1985); *Reddi–Wip v. Lemay Valve Co.*, 354 S.W.2d 913, 920 (Mo.App.1962), and must be derived from the instrument as a whole. *Laiben v. Department of Revenue*, 572 S.W.2d 173, 177 (Mo. banc 1978).

Where a lower court rules on a question of law it is not a matter of discretion. Questions of law are reserved for the independent judgment of the reviewing court. *City of Cabool v. Missouri State Board of Mediation*, 689 S.W.2d 51, 54 (Mo. banc 1985). We are not bound by a trial court's conclusions as to legal effects of a finding. *Kelly v. Maxwell*, 628 S.W.2d 931, 934 (Mo. App.1982).

Accordingly, the trial court's interpretation of the lease, particularly the meaning of the term "improvement," as used by two commercial, profit making companies is a matter of law and is not entitled to deference. The trial court's finding that the park has revenue-producing potential and therefore is an improvement is not binding on us as a reviewing court. To the contrary, the trial court's determination is in conflict with the terms of the lease and erroneously declares and applies the law, mandating reversal. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). It ignores the fact that the original parties to the lease were profit-making corporations. They used the term "improvements" and it is their meaning of that term which the trial court, and this court, must determine.

In interpreting the terms of the lease, then, we must gather the intent of the original parties to the lease, Wayco and Southern, from a consideration of the in-

strument as a whole. The terms of the original land lease conditioned extension of the lease beyond the original twenty-five years and six months term on the tenant erecting "improvements" on the premises at a cost of at least $150,000 exclusive of resurfacing. Our Supreme Court has defined the term "improvement" as: "A permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." *State v. Neill,* 397 S.W.2d 666, 669 (Mo. banc 1966).

As the parties have agreed that the lease is unambiguous, to be an "improvement," the construction must be a betterment to both parties. The tenant is not free to interpret the term "improvement" by itself. The construction of the parking garage was an improvement to both parties to the lease as evidenced by the option term of the lease being exercised. The evidence may support an irrelevant finding that the City believes a park is an improvement but it will not support a finding that either of the original parties intended a park to be a betterment when compared to a parking garage in the middle of downtown St. Louis. The construction of the park may be an improvement for the City or any of its citizens. It cannot be an "improvement" to Wayco or to Southern. Neither are now in the business of managing a park. They never were in that activity. The majority opinion fails to reach and decide the real legal issue, to wit, can the park be an "improvement" to the reversionary interest?

The consideration for the lease was $50,000 per year for the first term of the lease. For the renewal terms of the lease the consideration was $50,000 per year plus the reversionary interest in the improvements with a minimum value of $150,000. The lease when viewed as a whole supports that the reversionary interest in the improvements provided the additional consideration for extension of the lease term. City's donor, May Department Stores Co., valued its gift of the leasehold, including the garage at $5,000,000.00. Once improvements are made, certain aspects of the lease are triggered which protect the reversion. The tenant is required to pay taxes on the improvements in order to protect the landlord from liens; the tenant is required to insure the improvements and in event of casualty is required to apply the full proceeds to restoration of the improvements; and, the tenant has the duty to maintain the improvements. It is clear from the terms of the lease that Southern was to acquire a reversionary interest in the improvements during the extension term and that the improvements constitute additional consideration for extension of the lease. The fixed rental for 100 years makes no sense unless the value of the improvements remains on the premises.

It is also clear from the terms of the lease that the tenant was not free to remove improvements, as that term was used by the parties, during the extension term without replacing the improvements. The default provision allowed for forfeiture in the event of failure to pay rent or failure to comply with the covenants of the lease, such as insuring the premises, paying taxes, etc.

As forfeiture can occur at any given time under the lease, the landlord is entitled to have the improvements on the leasehold at all times to protect the reversionary interest. If the tenant was free to remove all improvements at any time during the extensions without replacement, a number of the lease provisions are nullified: (1) The provision that all improvements, exclusive of trade fixtures, belong to the landlord upon termination of the lease; (2) The provisions requiring tenant to maintain and insure the improvements; (3) The provision requiring tenant to pay taxes on the improvements and landlord to pay taxes on the land. The majority opinion nullifies these provisions and denies Southern of the benefit of its bargain.

It must then be determined whether the park constructed in place of the garage comprised an "improvement" under the terms of the lease. In making that determination, consideration must be given to the fact that the original parties under the

lease, Wayco and Southern, are commercial, for-profit Missouri Corporations. In addition, the leasehold is a fraction of a city block in the downtown business district which is zoned commercial. It is irrelevant that the lease was not labelled a commercial lease. Substance, rather than form, controls the interpretation of a contract. 17A C.J.S. *Contracts*, § 294e (1963). The majority opinion ignores the nature of the parties, but, as we have shown the nature of the original parties cannot be ignored when interpreting their language.

In accordance with our Supreme Court's definition of the term, an improvement must be a betterment that enhances the capital value of the realty. It logically follows then that an improvement cannot be an expense to the landlord. Moreover, in determining whether an addition to the leasehold is an improvement under the lease, the present value is relative in determining whether the landlord's reversionary interest is protected in case of forfeiture.

The present use of the property as a public park, even if it has some commercial potential as a park, is not equivalent to the leasehold improvement present when the term of the lease was extended. In all likelihood, the substitution of a revenue-generating parking garage as a leasehold improvement for a nonrevenue producing park has created an expense for Southern at the end of the lease terms. The measure of the expense would be the cost of removing the park construction. The May Department Stores Company donated to the City a lease interest with a value of $5,000,000.00 (an undisputed fact). Southern has been denied the benefit of that value in exchange for a mere possibility of some income potential from a public park. In the absence of proof that Southern is empowered to operate a park any finding that the park could have a commercial use is meaningless. There was no such evidence. A public park may be a betterment to the City, however, a reversionary interest in a fraction of a public park, no matter its cost or whether its use is lawful, is not a betterment to a Chapter 351 for-profit corporation. Moreover, the City was not a party to the lease and its definition of improvement is irrelevant to the task of interpretation.

Southern has been denied the benefit of the additional consideration for extension of the lease. The trial court clearly erred in determining the public park constructed by the City is an improvement. The evidence wholly fails to support the finding. By affirming the judgment of the trial court, the majority has created an exception to established landlord-tenant law for municipal tenants.

Additionally, I strongly disagree with the majority's holding that the lease authorizes destruction of the garage (without a complete replacement) and constitutes a special license in writing to commit waste, a defense to Missouri's anti-waste statute § 537.420, RSMo 1986.

In the absence of a contrary provision in a lease, title to a building erected by a tenant on a landlord's premises vests on its erection in the landlord. *Century Electric Co. v. Terminal Railroad Assn. of St. Louis*, 426 S.W.2d 58, 61 (Mo.1968). The fact that the lease expressly provides that title to the building is to vest in the landlord upon termination of the lease does not effect the landlord's interest in the building and his right to prevent its removal from the premises the instant it is erected. *Mercantile–Commerce Bank & Trust Co. v. Mid–City Realty Co.*, 348 Mo. 1006, 156 S.W.2d 730, 736 (Mo.1941). In our case, the removal without replacement with an equally valuable improvement was not authorized by the lease. Removal, without replacement, is not a license to commit waste. This rule is reinforced by the provisions in the lease: (1) extension conditioned on improvements of a minimum value; (2) maintenance; (3) insurance to at least 80% of value; (4) insurance proceeds to be used only to restore improvement; (5) etc. These provisions totally rebut any claim of unlimited license to commit waste.

The removal or destruction of buildings constituting a part of the real estate, as distinguished from buildings which belong to the tenant and remain his personal prop-

erty, is an injury to the reversionary right of the landlord for which the tenant is liable unless a lease provision permits such conduct. 49 Am.Jur.2d *Landlord and Tenant* § 250 (1970); *see also, Lustig v. U.M.C. Industries,* 637 S.W.2d 55, 59 (Mo. App.1982) (voluntary waste consists of a direct injury to the property "such as pulling down a structure"). It becomes a question of construction whether the removal or destruction is authorized by the lease. 49 Am.Jur.2d *Landlord and Tenant* § 251 (1970).

Missouri's anti-waste statute, § 537.420, RSMo 1986, provides:

> If any tenant, for life or years, shall commit waste during his estate or term, of anything belonging to the tenement so held, *without special license in writing so to do,* he shall be subject to a civil action for such waste, and shall lose the thing wasted and pay treble the amount at which the waste shall be assessed.

(emphasis added). The phrase usually employed to confer a special license in writing to commit waste is "without impeachment for waste." 93 C.J.S. *Waste* § 1 (1956); 78 Am.Jur.2d *Waste* § 6 (1975). No particular form of words is necessary, however, to make an estate without impeachment for waste so long as "a license to do the acts" is clearly given. 93 C.J.S. *Waste* § 1 (1956). Removal, where replacement is required, does not satisfy the statutory "special license" requirement. The lease does not contain any language authorizing voluntary waste.

The majority opinion relies principally on two provisions of the lease in asserting the City was authorized to destroy the garage. The first appears under the heading "Construction of New Buildings" and provides the tenant shall have the right to erect improvements on the premises during the term of the lease. The second provision appears under the heading "Option to Extend" and after obligating tenant to insure the improvements against casualty, to restore improvements upon casualty, and to maintain and repair the improvements, the provision further states that tenant may "reconstruct, alter or *replace* any improve-

ments then existing in such a manner as Lessee shall desire." (emphasis added). The majority has selected "replace" as the operative word. The use of the word "reconstruct" and the word "alter" suggests the meaning of the word "replace" as used by the parties. When taken in the context of the terms of the lease then, the majority's interpretation of the meaning of "replace" is inappropriate.

Further evidence of the majority's strained meaning of the term is gathered by their use of the secondary dictionary definition of "replace" as a "substitute or successor; to put something new in the place of." Under the preferred definition, the construction of a public park does not replace a parking garage since the preferred definition of "replace" is: "1. to place again: restore to a former place, position, or condition." Webster's Third New International Dictionary 1925 (1976). Likewise, the majority opinion fails to mention Black's definition of the term: "To place again, to restore to a former condition." Black's Law Dictionary 1168 (5th ed. 1979). It is clear that the construction of a public park does not restore the leasehold to its former commercial use by a commercial lessee. It is equally clear and certain that a park in exchange for a profitable garage structure was not an "improvement" as they used that term.

Nowhere within the lease is there language constituting a special license to destroy the parking garage if a comparable structure is not built. The lessee must replace an "improvement" with an "improvement" as that term was repeatedly used. The lessee's election lies with the manner of rehabilitation, not what type of improvement shall be built. The provisions granting a right to make improvements do not simultaneously confer a right to destroy. The garage was underground so that improvements in the form of new buildings could be constructed at the surface level without destruction of the garage. The tenant's right to "reconstruct, alter or replace any improvements" was couched in repair language and likewise does not grant a right of demolition without replacement.

A review of the lease as a whole demonstrates the City was not entitled to destroy the parking garage. One section of the lease is specifically entitled "Wrecking and Demolition" and gives the right to "wreck, demolish and remove all present buildings" to the landlord only and refers to the landlord's obligation to remove the structure existing at the time the lease was executed and provide the tenant with a level lot. Had the parties intended the tenant to have the same right they would have used equivalent language to confer such a right. Instead, the lease authorizes, indeed it requires, only a one-time demolition and removal of present buildings by the landlord at commencement of the lease.

Further, the right to extend the lease to a potential 100 year term was contingent on the tenant making improvements to the property at a value of at least $150,000 excluding resurfacing, thereby enhancing the landlord's reversionary interest in exchange for the long lease term. The majority opinion contends the contingency clause was for the benefit of the tenant so that the tenant would be assured it could have use of any costly improvements for an additional seventy-five year term. That may be true. It does not exclude the equally valid purpose of the lessor to protect its additional consideration for the long term lease. If protection of the reversionary interest was not the prime concern, however, it is unlikely that the rental would have been capped at $50,000 annually for the duration of the lease. Rather, the lease would have provided for escalation of rent upon renewal.[2] It is equally, if not more likely that the construction contingency was related to length of extension as a protection to both lessor and lessee.

Moreover, the lease obligates the tenant to repair and maintain the premises, insure the premises, and restore the premises in the event of casualty. A review of the lease as a whole does not disclose authorization for the City to destroy the parking garage. It strains logic to interpret the lease so that lessee was licensed to tear down and not replace the improvement where it was obligated to insure and replace the improvement if it was destroyed by a casualty.

Secondly, it would constitute waste for the City to convert the leased premises into an open park area. Waste includes the material alteration of a tenement by a tenant that "tends to destroy or lessen the value of the inheritance, or to destroy the identity of the property." 78 Am.Jur.2d *Waste* § 1 (1975).

Southern's reversionary interest in a parking garage with a yearly income of $400,000 has been substituted with a non-revenue producing open park area. Upon termination of the lease Southern would be required to expend considerable sums to restore the property to a commercial use. The City failed to offer any evidence to support a finding that Southern could realize any income from a park.

The majority concludes that the proposed open park area is authorized by the lease in that the lease allows the tenant to make improvements "in such form, size and character, at such cost and for such uses and purposes as Lessee shall determine," the only restriction being that the improvements be of lawful use. This view wholly ignores the requirement that the new structure be an improvement as that term was used by the parties to the lease.

As discussed previously, only a tortured interpretation would consider the public park an improvement as viewed by lessor. This view surely ignores the agreed requirement of "improvement" to the real estate. It excuses the lessee from maintaining an improvement as viewed by lessor. Furthermore, even where the terms of a lease provide that use of the premises is subject only to a "lawful use," a tenant still may not make a radical change in use, from the use originally contemplated, that is harmful to the reversion. *Knowles v. Moore*, 622 S.W.2d 803 (Mo.App.1981); *Ritchie v. State Board of Agriculture*, 219

---

**2.** Most nonresidential leases provide for escalation of rent. M. Friedman, 1 Friedman on Leases § 5.4 (1st ed. 1978).

Mo.App. 90, 266 S.W. 492 (1924). In *Ritchie*, the Kansas City Court of Appeals discussed the effect of the decision of the Supreme Court in *Moore v. Guardian Trust Co.*, 173 Mo. 218, 73 S.W. 143 (1903), on the case before it. The court noted that in *Moore* there were no restrictions of use placed on a tenant in a lease for an office building. The court noted, however, that if the tenant attempted to use the building "for a factory, a garage, or a hospital for contagious diseases, of course, no court would have held that the lease would permit any such use of the building." *Ritchie, supra*, 266 S.W. at 495. Likewise, in *Knowles*, the Court of Appeals for the Southern District held that a leasehold previously used to raise prairie hay could not be cultivated for crops even though the lease made reference to the tenant being in the farming business. The court held that the fact that the parties knew the premises were going to be used for farming did not establish that any kind of farming was authorized and would not be permitted where unsuited to the land and prejudicial to the fee holder. *Knowles, supra*, 622 S.W.2d at 805. Even in a lawful use, the tenant is limited by the prohibition against acts harmful to the landlord's reversion.

The lease, when examined as a whole, clearly indicates that the intention of the parties was to confine the use of the premises to a commercial context. Only within a commercial context, does the lease authorize any lawful use.

The original parties to the lease were both commercial parties. Tenant was a well known operator of parking garages. Prior to execution of the lease, a parking garage was operated on the property. Following execution of the lease, a parking garage was constructed on the premises and remained in operation for over thirty years. The subject property is located in the downtown business district adjacent to the stadium. The lease specifies that upon expiration of the lease title to all "trade fixtures" is retained by tenant, reinforcing the commercial nature of the lease. Moreover, the lease provides that in the event of condemnation by a government body the lease was to terminate, further indicating a noncommercial use was not contemplated. By implication this term suggests use of the leased real estate as a public park would not be an "improvement," and in fact would lead to termination of the lease. The proposed radical change in use of the premises constitutes waste within the meaning of § 537.420, RSMo 1986, and Southern should be freely allowed to declare the lease forfeited.

The failure of the city to comply with § 537.420 is a compelling, additional reason to reverse and remand. Section 441.030 and Section 537.420 express Missouri public policy and are controlling on the issue of waste in a landlord-tenant relationship for a term of years. The former statute entirely proscribes waste in a tenancy of two years or less and the latter permits waste where the tenancy is for two years or more on the condition of a "special license in writing so to do." The lease does not mention waste. In the absence of language expressly authorizing waste, § 537.420 prohibits waste. The statute further reinforces the prohibition on waste without express license by providing treble damages for waste committed without express license. The majority opinion implies a license to commit waste. Their decision is at odds with the decision in *Sparks v. Lead Belt Beer Company*, 337 S.W.2d 44, 46 (Mo.1960), where the Supreme Court held a tenant for years "is under an implied agreement to use the premises in a tenant-like manner, and not by his voluntary act unnecessarily to injure them." The majority opinion permits the city to violate the statute.

Even if the lease can be said to authorize destruction of the parking garage and conversion of the premises to an open park area, the City's actions still constitute equitable waste. The majority opinion ignores and fails to follow established blackletter law in its assertion that the doctrine of equitable waste is inapplicable because Southern's rights are governed by the terms of the lease. Equitable waste is specifically intended to apply where a tenant has been granted his estate without impeachment for waste but commits acts

beyond that contemplated by the parties. 5 American Law of Property § 20.14 (1952); H. McClintock, Handbook of the Principles of Equity § 141 (2d ed. 1948); 4 J. Pomeroy, Equity Jurisprudence and Equitable Remedies § 1348 (2d ed. 1919); 5 R. Powell, The Law of Real Property § 640[5] (1987 rev.); 4 G. Thompson, Commentaries on the Modern Law of Real Property § 1853 (1979).

A tenant without impeachment for waste is liable for acts which amount to "wanton, malicious, or unreasonable destruction of land and structures—that is, *for acts which a prudent owner of the fee would not perform" Id* (emphasis added). A prudent owner of the fee would not destroy an income producing structure and convert the leasehold into nonincome producing property.

The conduct of the City during this ordeal deserves mention in determining whether the destruction of the parking garage was "wanton, malicious, or unreasonable." First, the City has developed a park without the usual and available condemnation for public use. Second, the city became lax in its obligation to maintain the leased premises after receiving May's rights under the lease as a gift. The property was cited for numerous code violations, notices of which were sent to Southern as fee owner who in turn forwarded the notices to the City. Southern was required to expend considerable effort in seeking compliance by the City, who as tenant had the obligation of repair. Third, the City refused to join with Southern in seeking a judicial determination of whether the City's proposed use of the leasehold was authorized by the lease. Instead the City demolished the parking garage just two days before trial on the merits.

At the very least, the City has clearly committed equitable waste. The mere fact that the users of the park derive a benefit does not authorize the court to ignore the obligation of the City to compensate Southern for its loss because of equitable waste. The law recognizes several ways for the City to honor its obligations to Southern and build a park on the premises. We do not oppose development of the Gateway Mall Project or urban renewal of downtown St. Louis. Admittedly, the park beautifies the downtown area. It is inherently unfair, however, to expect a commercial corporation to involuntarily subsidize such a project.

The City had alternate means available to accomplish the same goal through use of its condemnation powers, by negotiation with Southern or by simply preserving the underground garage and converting the street level to public open space. The City eventually will be forced to use its condemnation powers to retain the property upon expiration of the lease. Instead, however, Southern has been forced to finance the project through loss of its reversionary interest in the improvements to the leasehold; a reversionary interest valued at five million dollars according to the tax deduction May was able to declare as a result of its donation of the leasehold to the City. The City then pays rent of $50,000.00 per year for the use of real estate valued by sub-lessee May at $5,000,000.00. The City then reduced the premises to bare land. It is unconscionable that Southern has been forced to subsidize the Gateway Mall Project under the guise that the lease may be read to authorize the construction of the park as an improvement. More to the point, Southern will receive annual rent equal to just 1% of the improvement as valued by May. Yet that improvement, which Southern had every expectation of receiving at the end of the lease, and in fact formed consideration for the agreement, was swallowed completely by the City's destruction of the improvement. In its place is left a park that many may, and indeed do enjoy. But that enjoyment must be tempered by the fact its legal foundation is tainted by misappropriation of the rights of a private party.

For the foregoing reasons, I respectfully dissent. I would reverse and remand for further proceedings consistent with the views expressed.

PUDLOWSKI, Chief Judge, dissenting.

I concur with the dissenting opinion of Judge Dowd. I write to explain an alter-

nate theory which requires reversal. Appellant owner has presented a sustained, forceful and convincing argument that the trial court erred in failing to recognize its claim that the city, as sub-lessee, committed equitable waste when it demolished the parking garage on the lessor's property. Assuming for the sake of argument that the lease authorizes lessee to commit waste by removing all revenue-producing improvements, the lessee nonetheless is liable to the owner for the loss of value by virtue of the doctrine of equitable waste. The majority finds the doctrine inapplicable in this situation. I disagree. The doctrine of equitable waste applies. It is independently sufficient to require reversal of the trial court's judgment.

The undisputed facts of this case have been extensively reported in the companion opinions. Certain pertinent facts, however, staunchly supporting appellant's contention that the city committed equitable waste, may not be ignored. Before the lessee could exercise its first option to extend the lease, it was incumbent upon the lessee under the provisions of the lease to construct an improvement. The lessee did so by constructing a parking garage in *1955* at a cost of $306,000. This expense, measured in 1955 dollars, indicates the substantial nature of the structure which existed before demolition and which became part of the lessor's reversionary interest. After the transfer of its interest to the city in 1982, sub-lessee (May Department Stores) declared the value of its leasehold interest for tax purposes at $5,000,000. The value of the reversion increased many fold between 1955 and 1982. The city chose to demolish a major improvement with gross annual income of $400,000 per year and substitute a public park which is only partially on the leased premises and detrimental to the reversionary interest.

The issue before this court is: "Did the city commit equitable waste?" Equitable waste has been defined as:

[A] form of waste recognized by the courts of chancery, usually defined as *consisting in such acts as at law would not be deemed to be waste* under the circumstances of the case, *but which,* in the view of a court of equity, *are regarded as waste from their manifest injury to the inheritance, (reversion)* although they are not inconsistent with the legal rights of the party committing them. *Equitable waste has also been defined as that which a prudent man would not do with his own property.*

78 Am.Jur.2d *Waste* 4 (1975) (emphasis added).

The majority concludes that the lessee's rights under the lease preclude the application of the doctrine of equitable waste. I believe this view misconstrues and misunderstands this viable doctrine and misinterprets the analysis in *Camden Trust Co. v. Handle,* 132 N.J.Eq. 97, 26 A.2d 865 (N.J. 1942), the authority cited by the majority. The *Camden* case in dicta suggests that equitable waste is applicable where the party aggrieved has equitable rights only. *Id.* at 871. However, a careful reading of the *Camden* opinion indicates that this is not the holding of the case but an example of the doctrine's application in a cited authority.

The majority analysis errs in reaching the conclusion that the lessor's rights are exclusively legal because they are governed by the terms of the lease. The *Camden* case states that the term equitable waste "has reference to cases where, by terms of the will, deed, settlement or lease, the tenant holds the land without impeachment of waste." [1] *Id.* at 870. *See also, Crowe v. Wilson,* 65 Md. 479, 5 A. 427 (1886) (doctrine applied in case dealing with long-term lease). The *Camden* case, therefore, does not stand for the proposition espoused by the majority opinion that the existence of legal rights based on a written lease bars the lessor's rights to equitable relief in appropriate circumstances.

1. The phrase "without impeachment for waste" is an early English phrase meaning that the actor is for some reason immune from a legal action for waste. *See* 5 R. Powell, The Law of Real Property P640[5] (Rev.Ed.1987).

The lease agreement creates legal rights and obligations for both the lessor and lessee. One of these rights is the lessee's right to erect improvements on the property "in such form, size and character, at such cost and for such uses and purposes as the Lessee shall determine, provided the same shall comply with all laws and ordinances." This right is coupled with the right to "replace any improvements then existing in such manner as Lessee shall desire." The broad provisions of the lease also impart the right and power of lessee to remove an improvement and replace it with another improvement. Such an act is "voluntary" waste if the replacement is not of at least equal value to both parties. If lessee is immunized by the terms of the lease from legal action, it does not follow that lessor is not entitled to equitable relief. The city's actions for its sole benefit "work manifest injury to the inheritance," although they are "not inconsistent with the legal rights" of the city under the terms of the lease.

It is true that the parties have legal rights governed by the lease agreement. Those rights and duties are interpreted by Judge Dowd's dissent. Those rights are neither comprehensive nor exclusive. The lease involved in this case confers broad powers on the lessee. Assuming the lease permits the lessee to commit what normally would be considered legal waste, we must remember that this lease has the potential of continuing for one hundred years. During that long term many changes could be reasonably anticipated. The lease simply does not provide an exclusive remedy for all events in this unique situation. "[E]quity will interpose in many cases and stay waste where there is no remedy at law. Chancery will interpose when the tenant affects the inheritance in an unreasonable and unconscientious manner, even though the lease be granted without impeachment of waste." *Duncombe v. Felt,* 45 N.W. 1004, 1006 (Mich.1890) (citations omitted).

The majority also relies upon a *portion* of the definition of equitable waste found at 93 C.J.S. *Waste* 1 (1956). However, the *entire* definition reads as follows:

"Equitable waste" is defined to be such acts as work manifest injury to the inheritance, although not inconsistent with the legal rights of the party who commits them; such acts as a prudent man would not do in the management of his own property, and *the doctrine is applicable where the party aggrieved has equitable rights only.*[2]

Moreover, the *Camden* case refers to more than one variation of the definition of equitable waste. *Camden,* 26 A.2d at 871. Among the definitions, it refers to equitable waste as " 'such acts as at law would not be esteemed to be waste under the circumstances of the case, but which in view of a Court of Equity are so esteemed from their manifest injury to the inheritance, although they are not inconsistent with the legal rights of the party committing them.' " *Id.*

The majority opinion properly finds that appellant charged the city with both statutory waste and equitable waste but concludes "that neither contention finds support in the lease." The opinion explains that "[t]he land as originally leased was vacant." This ignores other facts. In order for the lessee to exercise its first option to extend the lease, it was necessary to construct an improvement with a value of at least $150,000. Moreover, any improvement would revert to the lessor upon the termination of the lease. The majority opinion continues, "The lease authorized improvement and replacement of improvements at any time...." I have no quarrel with this finding; however, the doctrine of equitable waste requires that such replacement be done in a prudent manner and without harm or injury to the holder of the reversionary interest. The doctrine applies as a matter of equity and does not depend on "support in the lease."

The majority, in order to bolster its position, quotes the following statement from the *Camden* case: " 'Equitable waste' is a nebulous term—a doctrine of obscure limitations." *Camden,* 26 A.2d at 870. What

2. The underlined is the portion the majority cites as authority.

equitable theory is not nebulous and flexible in its application to the facts? Furthermore, the *Camden* court did not conclude, as the use of the quote implies, that the doctrine was not viable as a result. As a matter fact, the *Camden* opinion supplies us with an extensive list of various authorities on the subject of equitable waste and reports examples of the doctrine's application to various factual circumstances before it reached the following conclusion upon which the majority relies: "Thus it is that equitable jurisdiction in this behalf seems to have been confined to wanton, malicious and unconscientious acts of the particular tenant injurious to the inheritance, in contravention of the presumed will of the creator of the limited estate." *Id.* at 871. The *Camden* opinion, however, continues:

> It is largely upon this ground that equity has afforded a remedy where the acts denominated waste were not inconsistent with the legal rights of the holder of the partial estate. But the particular tenant is not so punishable for merely *permissive* waste grounded on the omission of repairs that are not commanded either by statute or the contract. Such is not included within this equitable jurisdiction.

*Id.* (emphasis added).

The law in Missouri is even more on point.

> 'Permissive' waste consists of mere neglect or omission to prevent an injury to the landlord's reversion or inheritance, such as allowing a structure to deteriorate for lack of repair, permitting a stranger to injure the property, or otherwise failing to perform a duty to protect the inheritance. 'Voluntary' or 'commissive' waste consists of some direct injury to the property committed by the tenant in possession, such as pulling down a structure or cutting down trees.

*Lustig v. U.M.C. Indus. Inc.*, 637 S.W.2d 55, 59 (Mo.App.1982).

The acts of the lessee in this case are clearly voluntary waste; whereas, in the *Camden* case, the court was dealing with acts of permissive waste by a mortgagor's grantee in a suit by a mortgagee. Thus,

while the dicta concerning equitable waste is useful to our understanding of the doctrine, the holding of the *Camden* case is not relevant in the factual context of this case.

Even if lessor's rights are not subject to legal remedies for permissive waste, the intentional actions of the city are so damaging to the lessor, the owner of the reversionary interest, that equity must intervene. Missouri law defines waste as "that which does a lasting damage to the freehold or inheritance, and tends to be permanent loss of the owner in fee, or to destroy or lessen the value of the inheritance." *Davis v. Clark*, 40 Mo.App. 515, 520 (1890). In applying this definition, the court must consider the property in question which is located in the heart of downtown St. Louis. Situated one block from Busch Stadium, it is at the center of an area revitalized by expenditure in excess of a billion dollars over the last two decades. The surrounding property consists of office buildings, hotels, retail shops, restaurants and similar businesses which are designed to reap commercial profits. The city has erected in the center of this commercial hub an open-air amphitheater with a fountain and reflecting pool. The "improvement" that currently exists has no commercial value to lessor. It provides instead a free public park which may be a civic improvement for the citizens of the metropolitan area but which has no value to the corporation which owns the reversionary interest in the property subleased to the city. This "improvement" is not one in which a prudent owner of the property would be likely to invest based on the condition and current commercial use of other property in the area. Moreover, the change to a public park reduces the market value of the owner's reversionary interest to a negative value since no reasonable investor would purchase a public park complete with an concrete open-air amphitheater. At the end of the lease, the situation becomes even more detrimental to the lessor. Because the lessor owns only two-thirds of the property upon which the park has been constructed and the city owns the remaining one-third, the lessor would be unable to continue to use the

property as it exists today without purchasing the remainder from the city or removing the amphitheater, a massive structure constructed of tons of concrete poured into a hole carved deep in the ground. The cost of either option would be exorbitant. The alteration has significantly wiped out the present and future market value of the lessor's interest.

Modern legal-economists recognize the waste theory and acknowledge that in the landlord-tenant relationship two entities have property rights in the same thing. *See* R. Posner, Economic Analysis of Law 63 (3d Ed.1986). This division of ownership "creates incentives for inefficient use" of the property. *Id.* It is, therefore, the role of the law to regulate this division of ownership. *Id.* at 64. In its regulation, courts have as one of their tools the body of law known as the law of waste. "From an economic standpoint this body of law is aptly named." R. Posner, Economic Analysis of Law 53 (2d Ed.1977). Any use which fails to maximize the profit potential of the property is economic waste and is an unreasonable action for a prudent property owner. The maximized economic use of this property does not include that of a public park. No prudent person would invest in a project which provides no potential for an economic return on investment. Although an open-air mecca in the center of the city may be esthetically pleasing, it is not commercially reasonable. It certainly is not what a prudent person would do with a prime piece of commercial real estate.

II Missouri Tort Law 26.11 (MoBar 1980, 1984), states:

Although the authors found no case authority on equitable waste in this state, there appears to be no reason why a Missouri court would hesitate to use its equitable powers under the proper circumstances. This is especially likely since there is case authority suggesting that a life tenant is a trustee for the remainderman and, as such, occupies a fiduciary relationship to him. *Miller v. Bowen Coal & Mining Co.*, 40 S.W.2d 485 (Mo.App.1931).

Finding the present situation to be a proper circumstance for the application of the doctrine of equitable waste, I am convinced that the lower court and the majority of this court have ignored a remedy to which the aggrieved lessor is entitled. Appellant's claim that the trial court erred when it failed to recognize its contention that the city's actions constituted equitable waste requires this court to reverse the judgment of the trial court and remand the case with instructions to terminate the lease and conduct a trial to determine the lessor's damages.